# 24-725(L)

24-728(CON)

## United States Court of Appeals
## for the Second Circuit

A.H., by her next friend E.H., R.D., by her next friend M.D.,
J.D., by his next friend D.D., H.L., on behalf of themselves
and all others similarly situated, A.B., on behalf of themselves
and all others similarly situated, J.S., on behalf of themselves
and all others similarly situated, J.C.M., on behalf of themselves
and all others similarly situated, L.P., by her next friend C.P.,
DISABILITY RIGHTS NEW YORK,

*Plaintiffs-Appellants,*

T.C., by his next friend D.S., M.L., on behalf of themselves
and all others similarly situated,

*Plaintiffs,*

*(caption continues inside front cover)*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLEES

BARBARA D. UNDERWOOD
  *Solicitor General*
MATTHEW W. GRIECO
  *Senior Assistant Solicitor General*
CLELAND B. WELTON II
  *Assistant Solicitor General*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellees
28 Liberty Street
New York, New York 10005
(212) 416-6197

Dated: July 3, 2024

(*caption continues from front cover*)

E.B., M.W., by his next friend T.D., J.D.C.,
J.P.S., by his next friend S.S., M.F., O.A.,
M.Y., by his next friend B.L., C.H.,

*Intervenor-Plaintiffs-Appellants*,

v.

NEW YORK STATE DEPARTMENT OF HEALTH, MARY T. BASSETT,
in her official capacity as Commissioner of the New York State
Department of Health, NEW YORK STATE OFFICE FOR
PEOPLE WITH DEVELOPMENTAL DISABILITIES, KERRI NEIFELD,
in her official capacity as Commissioner of the New York
State Office for People with Development Disabilities,

*Defendants-Appellees*.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................iii

PRELIMINARY STATEMENT ................................................................. 1

QUESTIONS PRESENTED ...................................................................... 3

STATEMENT OF THE CASE ................................................................... 4

  A. The Medicaid Home and Community-Based Services Waiver Program ........................................................ 4

  B. The Plaintiffs and Proposed Intervenors ................................. 6

  C. Procedural History ................................................................. 7

  D. The District Court's Order .................................................... 12

SUMMARY OF ARGUMENT ................................................................... 14

STANDARDS OF REVIEW ...................................................................... 16

ARGUMENT ............................................................................................. 16

POINT I

THE DISTRICT COURT CORRECTLY DISMISSED THE AMENDED COMPLAINT FOR LACK OF SUBJECT-MATTER JURISDICTION ................. 16

  A. Disability Rights New York Lacks Article III Standing. ....... 16

  B. The Individual Plaintiffs' Claims Are Moot, and No Exception Applies................................................................. 26

    1. The individual plaintiffs' claims do not trigger the exception for "inherently transitory" classes. ................. 27

**Page**

2.  The individual plaintiffs' claims do not trigger the exception for claims that are "capable of repetition yet evading review."..................................................... 33

3.  The individual plaintiffs' claims do not trigger the "voluntary cessation" exception....................................... 36

POINT II

THE DISTRICT COURT PROPERLY DENIED THE MOTION TO INTERVENE .......................................................................... 38

CONCLUSION ....................................................................... 44

# TABLE OF AUTHORITIES

**Cases**                                                  **Page(s)**

*Association for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*,
19 F.3d 241 (5th Cir. 1994) ................................................................ 20

*Authors Guild v. Open AI, Inc.*,
345 F.R.D. 585 (S.D.N.Y. 2024) ........................................................ 41

*Berni v. Barilla S.p.A.*,
964 F.3d 141 (2d Cir. 2020) ............................................................... 31

*Calderon v. Clearview AI, Inc.*,
No. 20-cv-1296, 2020 WL 2792979 (S.D.N.Y. May 29, 2020) ........... 41

*Comer v. Cisneros*,
37 F.3d 775 (2d Cir. 1994) ................................................................. 28

*Connecticut Parents Union v. Russell-Tucker*,
8 F.4th 167 (2d Cir. 2021) ................................................................. 17

*Dennin v. Connecticut Interscholastic Athletic Conf., Inc.*,
94 F.3d 96 (2d Cir. 1996) ................................................................... 33

*Diduck v. Kaszycki & Sons Contractors, Inc.*,
149 F.R.D. 55 (S.D.N.Y. 1993) .......................................................... 42

*Disability Advocates, Inc. v. New York Coal. for Quality Assisted Living, Inc.*,
675 F.3d 149 (2d Cir. 2012) ................................... 18, 20-21, 23-24, 26

*Disability Rights N.Y. v. New York*,
No. 17-cv-6965, 2019 WL 2497907 (E.D.N.Y. June 14, 2019) ...... 24-25

*Do No Harm v. Pfizer Inc.*,
96 F.4th 106 (2d Cir. 2024) ............................................................... 17

*Doherty v. Bice*,
101 F.4th 169 (2d Cir. 2024) ....................................................... 16, 33

**Cases**                                                                                      **Page(s)**

*Eckert v. Equitable Life Assurance Soc'y,*
    227 F.R.D. 60 (E.D.N.Y. 2005) ............................................................. 42

*Elisa W. v. City of New York,*
    82 F.4th 115 (2d Cir. 2023) ........................................................... 27-28

*Exxon Mobil Corp. v. Healey,*
    28 F.4th 383 (2d Cir. 2022) ...................................................... 33, 35-36

*Farrell v. Hochul,*
    No. 22-517, 2023 WL 3014758 (2d Cir. Apr. 20, 2023) ...................... 36

*Food & Drug Admin. v. Alliance for Hippocratic Med.,*
    602 U.S. 367 (2024) ................................................................... 17, 20

*Gaddis v. Wyman,*
    304 F. Supp. 713 (S.D.N.Y. 1969) ................................................... 42

*Grossman v. GEICO Cas. Co.,*
    No. 21-2789, 2022 WL 1656593 (2d Cir. May 25, 2022) ................... 37

*Hernandez v. Conriv Realty Assocs.,*
    182 F.3d 121 (2d Cir. 1999) ............................................................ 38

*Hollingsworth v. Perry,*
    570 U.S. 693 (2013) ........................................................................ 19

*Hunt v. Washington State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ................................................................... 18, 20

*In re Bank of N.Y. Derivative Litig.,*
    320 F.3d 291 (2d Cir. 2003) ....................................................... 39, 43

*In re Bear Stearns Cos., Inc. Securities, Derivative, & ERISA Litigation,*
    297 F.R.D. 90 (S.D.N.Y. 2013) ....................................................... 42

*In re Holocaust Victim Assets Litig.,*
    225 F.3d 191 (2d Cir. 2000) ............................................................ 18

iv

| Cases | Page(s) |
|---|---|

*In re Payment Card Interchange Fee & Merch. Disc.*
   *Antitrust Litig.*,
   827 F.3d 223 (2d Cir. 2016) .............................................. 25

*Indiana Prot. & Advoc. Servs. Comm'n v. Indiana Fam.*
   *& Soc. Servs. Admin.*,
   630 F. Supp. 3d 1022 (S.D. Ind. 2022).......................... 23-24

*International Code Council, Inc. v. UpCodes Inc.*,
   43 F.4th 46 (2d Cir. 2022)................................................. 37

*International Union, United Auto., Aerospace & Agric.*
   *Implement Workers v. Brock*,
   477 U.S. 274 (1986)........................................................... 25

*Irish Lesbian & Gay Org. v. Giuliani*,
   143 F.3d 638 (2d Cir. 1998) ............................................. 33

*J.D. v. Azar*,
   925 F.3d 1291 (D.C. Cir. 2019) ........................................ 30

*Joseph S. v. Hogan*,
   561 F. Supp. 2d 280 (E.D.N.Y. 2008)............................... 25

*L.C. ex rel. Zimring v. Olmstead*,
   138 F.3d 893 (11th Cir. 1998) .......................................... 34

*Lillbask ex rel. Mauclaire v. Connecticut Dep't of Educ.*,
   397 F.3d 77 (2d Cir. 2005) ............................................... 36

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)........................................................... 17

*MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*,
   471 F.3d 377 (2d Cir. 2006) ............................................. 16

*Mejia v. Time Warner Cable Inc.*,
   No. 15-cv-6445, 2017 WL 3278926 (S.D.N.Y. Aug. 1, 2017) ............. 41

| Cases | Page(s) |
|---|---|

*Mental Hygiene Legal Serv. v. Cuomo,*
609 F. App'x 693 (2d Cir. 2015) ...................................... 18

*Missouri Prot. & Advoc. Servs., Inc. v. Carnahan,*
499 F.3d 803 (8th Cir. 2007) ......................................... 20

*Norman v. Connecticut State Bd. of Parole,*
458 F.2d 497 (2d Cir. 1972) .......................................... 42

*Olmstead v. L.C. ex rel. Zimring,*
527 U.S. 581 (1999) ............................................... 31, 34

*Peregrine Myanmar Ltd. v. Segal,*
89 F.3d 41 (2d Cir. 1996) ............................................ 31

*Robidoux v. Celani,*
987 F.2d 931 (2d Cir. 1993) .......................................... 28

*Rosen v. Siegel,*
106 F.3d 28 (2d Cir. 1997) ........................................... 31

*Salazar v. King,*
822 F.3d 61 (2d Cir. 2016) ........................................ 28-29

*Siegel v. Apergis,*
610 F. App'x 15 (2d Cir. 2015) ....................................... 39

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016) .................................................. 24

*St. John's Univ., N.Y. v. Bolton,*
450 F. App'x 81 (2d Cir. 2011) ....................................... 40

*St. Pierre v. Dyer,*
208 F.3d 394 (2d Cir. 2000) ....................................... 38-39

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ............................................... 16-17

| Cases | Page(s) |
|---|---|

*Travis v. Navient Corp.*,
284 F. Supp. 3d 335 (E.D.N.Y. 2018)..................................41

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
517 U.S. 544 (1996).............................................21, 24

*United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*,
985 F.2d 1148 (2d Cir. 1993) ........................................22

*United States v. Texas*,
599 U.S. 670 (2023).................................................16

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000).................................................22

*Virginia Off. for Prot. & Advoc. v. Stewart*,
563 U.S. 247 (2011)..............................................22-23

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)..............................................30-31

*Washington Elec. Coop., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*,
922 F.2d 92 (2d Cir. 1990) ......................................39-40

**Statutes**

42 U.S.C.
§ 1396a ...........................................................31
§ 1396n ........................................................4, 31
§ 10805 ...........................................................7
§ 15043 ...........................................................7

**Regulations**

28 C.F.R. § 35.130 ................................................31

14 N.Y.C.R.R. § 635-10.1 et seq. ..................................4

vii

**Rules**                                                    **Page(s)**

Federal Rule of Appellate Procedure 4 .................................................. 13

Federal Rules of Civil Procedure
    23.........................................................................................25, 30
    24.........................................................................................38-39
    58......................................................................................... 13

## PRELIMINARY STATEMENT

Disability Rights New York (DRNY), a corporation that advocates on behalf of individuals with disabilities, sued the New York State Department of Health (DOH) and the New York State Office for People with Developmental Disabilities (OPWDD). DRNY alleged that the defendants violated federal law by unreasonably delaying the placement of individuals with developmental disabilities into residential facilities. Although DRNY was named as a plaintiff, it did not allege any injury to DRNY itself. Nor did DRNY claim to operate as a membership organization authorized to litigate on its members' behalf. DRNY instead asserted standing to litigate on behalf of all New Yorkers with developmental disabilities, including unidentified nonparties.

Ten individual plaintiffs joined DRNY's lawsuit. While the case was pending, however, all of these individuals secured placement in residential facilities—rendering their claims moot. In an attempt to save the case from dismissal, eight more individuals moved to intervene.

The U.S. District Court for the Southern District of New York (Vyskocil, J.) dismissed the case for lack of jurisdiction, and denied the motion to intervene. This Court should affirm.

First, DRNY lacks Article III standing. Eschewing any traditional standing theory, DRNY asserts that Congress granted it authority to sue on behalf of the entire community of individuals with developmental disabilities. But for an organization to have Article III standing, it must demonstrate injury either to the organization itself or to a member thereof. DRNY has not established that it has any injured members, and it cannot satisfy Article III by alleging injuries to unidentified individuals who are neither members of the organization nor parties to the lawsuit.

Second, no exception saves the individual plaintiffs' moot claims from dismissal. Although the plaintiffs denominated this case as a class action, the putative class is not "inherently transitory": An individual plaintiff with a live claim could have obtained adjudication of a motion for class certification had one been filed before the case became moot. These plaintiffs simply failed to make such a motion while this action was pending in the district court for eighteen months. The "capable of repetition" and "voluntary cessation" doctrines also do not apply, because there is no reason to believe that any individual plaintiff will ever again seek placement in a residential facility.

Third, the proposed intervenors lack any cognizable interest in this case, as would be necessary to justify intervention. The proposed intervenors have no interest in the individual plaintiffs' now-moot claims. Nor do they have an interest in the claims of the putative plaintiff class—particularly because that putative class would not satisfy the requisites to class certification. And the proposed intervenors themselves were all placed in residential facilities by the time of the district court's decision—meaning that their individual claims are also moot. Even if the proposed intervenors could assert live claims, the proper course would have been to file their own lawsuit rather than to prolong this one.

## QUESTIONS PRESENTED

1.     Whether the district court correctly dismissed this action for lack of subject matter jurisdiction, where (a) the organizational plaintiff failed to demonstrate an injury-in-fact either to the organization itself or to a member thereof; and (b) the individual plaintiffs' claims are moot, and no mootness exception applies.

2.     Whether the district court properly denied the motion to intervene because the proposed intervenors lack a cognizable interest in the plaintiffs' claims.

3

## STATEMENT OF THE CASE

**A.    The Medicaid Home and Community-Based Services Waiver Program**

OPWDD licenses, regulates, and funds facilities that provide housing and related services to individuals with developmental disabilities. (Joint Appendix (J.A.) 165.) Many such individuals would ordinarily require the level of care provided in an institutional setting (e.g., a hospital or a nursing home). But through Medicaid's home and community-based services (HCBS) waiver program, tens of thousands of New Yorkers with developmental disabilities are able to live in non-institutional residential facilities while still receiving the care that they need. *See* 42 U.S.C. § 1396n(c); 14 N.Y.C.R.R. § 635-10.1 et seq. (*See* J.A. 166.)

More than 37,000 individuals live and receive services in OPWDD-certified residential facilities, making New York's certified residential housing system the largest in the country. (J.A. 166.) An average of 1,000 new residents are placed within the system each year. (J.A. 166.) The vast majority (82%) of OPWDD-certified residential facilities are operated by independent (or "voluntary") providers in the nonprofit and private sectors; OPWDD itself operates only a limited number of such facilities. (J.A. 167.)

4

Because eligible individuals may face a range of developmental and intellectual disabilities, and may have a wide variety of unique clinical needs, behavioral issues, and placement preferences, the process for placing an eligible individual in a residential facility is necessarily complex and collaborative. A successful placement requires OPWDD, the prospective resident (and/or the resident's family), and the residential provider to reach consensus that a particular opportunity is a safe and appropriate fit for the prospective resident. (*See* J.A. 146, 168-178, 181-182.) Even if a given provider has available bed space, an individual cannot be placed with that provider unless the provider determines—in the exercise of professional judgment—that the facility has the resources to meet the individual's needs while ensuring the continued health and safety of the facility's staff and existing population. (*See* J.A. 147, 154, 177, 185-186.) OPWDD has no statutory, regulatory, or contractual authority to compel a voluntary provider to accept an individual for residential placement. (J.A. 154, 186.)

Residential care facilities (both voluntary and state-operated) across New York have for years labored under an extended staffing short-age, which was significantly exacerbated by the COVID-19 pandemic.

5

(*See* J.A. 148-153, 184.) Salary increases, work incentives, and recruitment efforts have so far proven insufficient to fully resolve this crisis. (*See* J.A. 153, 160.) The State's inability to maintain sufficient staffing levels has forced it to close more than 138 state-operated residential programs since 2019—eliminating 858 residential opportunities. While not all of those beds were occupied when the facilities closed, the closures forced 616 individuals to change residences. (J.A. 152.) Those facilities that continue to operate have struggled to maintain staffing levels sufficient to ensure their residents' health and safety. (J.A. 154.) The staffing shortage has severely hindered OPWDD's ability to place eligible individuals in home and community-based settings. (J.A. 148-153, 184.)

**B.    The Plaintiffs and Proposed Intervenors**

The individual plaintiffs and proposed intervenors in this lawsuit are persons with varying developmental disabilities, some of whom appear in this litigation through next friends. Each individual sought to be transferred from an institutional facility (e.g., a hospital or rehabilitation center) into a residential care facility. Each individual alleges that he or she faced unreasonable delays in securing placement in a residential facility. (*See* J.A. 25-27, 37-56, 77-79, 90-113, 351-353, 363-381.)

6

DRNY (the trade name under which Disability Advocates, Inc. currently conducts business) is an advocacy group organized as an independent corporation under New York law. (J.A. 79.) It does not claim to operate as a membership organization. DRNY has been designated as New York's protection and advocacy system under federal law. (J.A. 79.) Under that designation, DRNY is authorized (inter alia) to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights" of individuals with developmental disabilities. 42 U.S.C. § 15043(a)(2); *see id.* § 10805(a)(1)(B) (similar as to individuals with mental illness).

## C.    Procedural History

Eight individual plaintiffs and DRNY filed this lawsuit in June 2022, naming as defendants DOH, OPWDD, and those agencies' commissioners. (J.A. 22-73.) After defendants notified plaintiffs and the district court of their intention to file a motion to dismiss (*see* J.A. 13, 16), plaintiffs filed an amended complaint in October 2022 (J.A. 74-135). The amended complaint again named eight individuals and DRNY as plaintiffs—but it dropped two individual plaintiffs who had transitioned to suitable residential facilities (T.C. and M.L.) and replaced those individ-

7

uals with two new individual plaintiffs (L.P. and J.C.M.). (*Compare* J.A. 22 *with* J.A. 74; *see* J.A. 216, 442.)[1]

Broadly speaking, plaintiffs allege that defendants violated various federal statutes and the Due Process Clause by failing to place the individual plaintiffs in residential facilities promptly upon their request. (*See* J.A. 75-76, 123-132.) The individual plaintiffs also claimed to represent a putative class comprised of "[i]ndividuals with disabilities who have been, or will be, determined by OPWDD to be eligible for HCBS Waiver services and certified residential opportunities, but remain institutionalized due to Defendants' failure to deliver these services." (J.A. 121, 132.) Plaintiffs sought declaratory relief and an injunction requiring defendants to place the individual plaintiffs in residential facilities within sixty days, and to accelerate the placement of putative class members into residential facilities. (J.A. 132-133.)

In October 2022, plaintiffs moved for a preliminary injunction requiring defendants "promptly" to place the individual plaintiffs in residential facilities. (J.A. 14; S.D.N.Y. ECF No. 37.) The district court

---

[1] The district court granted the individual plaintiffs' motion to proceed under pseudonymous initials. (J.A. 14; S.D.N.Y. ECF No. 42.)

8

denied that motion on December 15, 2022, ruling (inter alia) that plaintiffs were unlikely to prevail on the merits. (J.A. 210-233.) The court concluded that plaintiffs had not established that defendants unreasonably delayed placing the individual plaintiffs in residential facilities (J.A. 227); that defendants' temporary inability to place the individual plaintiffs in such facilities had been caused by the absence of placement opportunities (J.A. 229); and that an order requiring defendants to immediately place the individual plaintiffs in residential facilities would have impermissibly required fundamental alterations to the State's residential treatment program (J.A. 231). The court specifically found that requiring defendants to place the individual plaintiffs in residential facilities over the objections of those facilities' operators would endanger individuals who already resided at those facilities. (J.A. 225.) Plaintiffs did not appeal the denial of the preliminary injunction.

In December 2022, defendants moved to dismiss the amended complaint in part. (J.A. 17, 187-209.) As relevant here, defendants explained that DRNY lacks Article III standing: Defendants' actions do not impose any injury-in-fact upon DRNY itself, and DRNY did not allege facts sufficient to make out the "representational" or "associational"

9

standing theory through which a membership organization can establish standing based on an injury-in-fact suffered by its members. (J.A. 207-209.) In response to defendants' motion, DRNY did not claim any injury to itself, and expressly disclaimed any reliance on the associational standing doctrine. (Mem. of Law in Opp'n at 23 n.15 (Dec. 8, 2022), S.D.N.Y. ECF No. 69.) DRNY instead argued that Congress conferred Article III standing upon DRNY to sue "on behalf of people with disabilities in New York" who are neither parties to the litigation nor members of DRNY. (*Id.* at 23-25.)

In July 2023—after the motion to dismiss was already fully briefed—eight additional individuals with disabilities (represented by the same attorneys as the original plaintiffs) filed a motion to intervene as plaintiffs. (J.A. 17, 323-343.) The proposed intervenors argued that intervention was appropriate because all but one of the individual plaintiffs had by that time been placed in residential facilities, mooting those plaintiffs' claims. (J.A. 327-328, 345.) The motion to intervene was accompanied by a proposed intervenor complaint (J.A. 348-403) that is (apart from the identities of the plaintiffs) materially identical to the existing amended

10

complaint (*compare* J.A. 75-77, 80-90, 114-135 *with* J.A. 349-351, 353-363, 381-403).

In January 2024—while the motion to dismiss and the motion to intervene remained pending—defendants submitted a letter requesting a pre-motion conference in anticipation of a further motion to dismiss. (J.A. 441-443.) As the letter explained, all of the individual plaintiffs had by that time been placed in residential facilities, leaving no plaintiff with a live case or controversy. (J.A. 442.) Plaintiffs' responsive letter conceded that all of the individual plaintiffs had been placed in residential facilities, such that their claims were moot. (J.A. 445.) Plaintiffs' letter also acknowledged that many of the proposed intervenor plaintiffs had been placed in residential facilities. (J.A. 445.) In fact, defendants reported in a reply letter that all of the proposed intervenors "ha[d] already been transitioned to the community" (i.e., placed in residential facilities) by February 1, 2024. (J.A. 496.) Although plaintiffs suggested that the case remained justiciable as a class action (J.A. 445-446), plaintiffs never moved to certify a class.

11

## D.    The District Court's Order

On February 20, 2024, the district court (Vyskocil, J.) entered an order in which the court (i) dismissed DRNY's claims for lack of Article III standing; (ii) dismissed the individual plaintiffs' claims as moot; and (iii) denied the motion to intervene. (Special Appendix (SPA) 1-21.)

First, the court determined that DRNY lacks standing because it asserts no individual injury and expressly disclaims reliance on the doctrine of associational standing. (SPA 13-14.) Although DRNY has been granted "*statutory* authority to vindicate the rights of the disabled" in a proper case, the district court reasoned that Congress cannot override the irreducible constitutional prerequisites to federal jurisdiction. (SPA 14 (emphasis added).) As DRNY does not satisfy those prerequisites, it lacks standing. (SPA 13-14 & n.2.)

Second, the district court determined that the individual plaintiffs' claims are moot because they have been placed in residential facilities and thus "have received precisely the outcome they sought when they brought this lawsuit." (SPA 14.) This action therefore no longer presents a live and justiciable case or controversy between the individual plaintiffs and the defendants. (SPA 14-15.)

12

Third, the court denied the motion to intervene, ruling that the motion was untimely and that the proposed intervenors had no interest in the claims asserted by the individual plaintiffs. (SPA 15, 18-20.) The court also noted that the proposed intervenors (like the individual plaintiffs themselves) could not likely be appointed to represent a plaintiff class in view of the myriad differences among putative class members in terms of (e.g.) diagnoses, behavioral challenges, staffing requirements, and preferences—and the consequent impossibility of crafting lawful and effective class-wide relief. (SPA 15-18, 20-21.)

Plaintiffs and the proposed intervenors filed notices of appeal. (J.A. 498-503.)[2]

---

[2] As of this filing, the district court has not entered final judgment. *See* Fed. R. Civ. P. 58(a), (b)(1)(C). Plaintiffs' appeals are therefore premature. But the notices of appeal will be treated as timely filed upon the entry of judgment, which will take place on or before July 19, 2024. *See* Fed. R. Civ. P. 58(c)(2)(B); Fed. R. App. P. 4(a)(2), (7).

## SUMMARY OF ARGUMENT

**I.**     The district court correctly dismissed the amended complaint.

**A.**     DRNY does not have Article III standing because it does not allege the requisite injury-in-fact. DRNY does not claim that it faces any injury itself, and it does not claim to operate as a membership organization with "representational" or "associational" standing to sue based on alleged injury to individual members. DRNY instead contends that Congress authorized it to bring suit on behalf of the entire community of individuals with developmental disabilities. But Congress cannot erase the foundational constitutional requirement that a plaintiff must demonstrate a concrete and particularized injury. Lacking such an injury to itself and declining to present itself as a membership organization with standing to sue on behalf of injured members, DRNY cannot bring this lawsuit in federal court.

**B.**     The individual plaintiffs' claims are moot, and no exception saves those claims from dismissal. The exception for inherently transitory class actions does not apply—both because the claims at issue are not so transitory as to prevent adjudication of a motion for class certification, and because such a motion (if filed) would not succeed. The exception for

14

conduct that is capable of repetition, yet evading review does not apply because the individual plaintiffs have been placed in long-term residential facilities and face no reasonable prospect of having to seek placement in such a facility ever again. And the exception for cases of voluntary cessation does not apply, for the same reason. As there is no live controversy here, the district court correctly dismissed the case.

II.    The district court properly denied the proposed intervenors' motion to intervene. The court's disposition of the amended complaint did not adjudicate the merits of any claim, and so it cannot impair the proposed intervenors' interests. The proposed intervenors, moreover, never had a cognizable interest in this case in the first place. Placement of the individual plaintiffs in appropriate residential facilities did not affect the proposed intervenors' requests for placement in residential facilities suited to their own needs and preferences. And the proposed intervenors have no cognizable interest in entering the case for the purpose of representing a putative class that is not susceptible of certification. The proposed intervenors' claims are moot in any event— and even if the claims were live, the proper course would be to file their own lawsuit, not to extend the life of this case.

15

## STANDARDS OF REVIEW

The district court's determination to dismiss the amended complaint for lack of subject-matter jurisdiction is reviewed de novo. *Doherty v. Bice*, 101 F.4th 169, 172 (2d Cir. 2024).

The district court's determination to deny the motion to intervene is reviewed for abuse of discretion. *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 389 (2d Cir. 2006).

## ARGUMENT

## POINT I

### THE DISTRICT COURT CORRECTLY DISMISSED THE AMENDED COMPLAINT FOR LACK OF SUBJECT-MATTER JURISDICTION

### A. Disability Rights New York Lacks Article III Standing.

The district court correctly dismissed DRNY's claims for failure to establish Article III standing. (SPA 13-14.) DRNY declines to assert any recognized basis for finding that an organization has standing, and its alternative theory of standing is meritless.

Standing is a "bedrock constitutional requirement," *United States v. Texas*, 599 U.S. 670, 675 (2023), under which a plaintiff must demonstrate a "personal stake" in a concrete case or controversy, *TransUnion*

16

*LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quotation marks omitted).

Among other things, the standing requirement protects "the autonomy of

those who are most directly affected so that they can decide whether and

how to challenge the defendant's action." *Food & Drug Admin. v. Alliance*

*for Hippocratic Medicine*, 602 U.S. 367, 379-80 (2024) (quotation marks

omitted). To bring a claim for prospective relief, a plaintiff must show:

(i) that the plaintiff likely will suffer a concrete and particularized injury-

in-fact, (ii) that the injury likely will be caused by the defendant, and

(iii) that the requested relief would likely redress the injury. *Id.* at 380;

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 & n.1 (1992).

An organization can satisfy Article III in either of two ways: by

showing a direct injury to the organization itself, or by establishing

"associational" (or "representational") standing based on an injury-in-fact

suffered by a particular member of the organization. *See Do No Harm v.*

*Pfizer Inc.*, 96 F.4th 106, 112-14 (2d Cir. 2024); *Connecticut Parents Union*

*v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021). While a nonmember-

ship organization may invoke representational standing, to do so it must

show that its injured constituents exhibit "indicia of membership"—most

importantly, representation and control—such that the entity "function[s]

17

effectively as a membership organization." *Disability Advocates, Inc. v. New York Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 157-59 (2d Cir. 2012) (quotation marks omitted); *see Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 344-45 (1977); *Mental Hygiene Legal Serv. v. Cuomo*, 609 F. App'x 693, 695 (2d Cir. 2015); *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 196 (2d Cir. 2000).

DRNY does not attempt to establish either form of standing. It does not allege that the organization itself faces any prospect of injury. And having expressly disavowed associational standing in the district court (SPA 13; Mem. of Law in Supp. at 23 & n.15, S.D.N.Y. ECF No. 69), DRNY has never attempted to show that it satisfies the fundamental requirements for invoking that theory—namely, an injury-in-fact suffered either by a member of the organization or by a constituent having indicia of membership. *See Disability Advocates,* 675 F.3d at 157-59.[3]

---

[3] Twelve years ago in *Disability Advocates*, this Court held that DRNY (then proceeding under its corporate name) lacked associational standing. *See* 675 F.3d at 157-59. At that time, DRNY had not been designated as a protection and advocacy system. This Court therefore did not reach the question whether designation as a protection and advocacy system would be sufficient to establish the requisite indicia of membership. *Id.* at 158. Although DRNY has subsequently been designated as a

(*continued on the next page*)

18

Instead of relying on existing standing doctrine, DRNY asserts a novel theory to which it refers as "congressionally authorized representational standing." Br. for Pl.-Appellant Disability Rights New York (DRNY Br.) at 15-16, 18 n.3. DRNY contends that its designation as New York's protection and advocacy system (see *supra* at 7) is alone sufficient to confer standing to sue on behalf of unidentified nonparty individuals "with intellectual and developmental disabilities" who (according to DRNY) "have been injured by unnecessary institutionalization." DRNY Br. at 15-16. But this theory of third-party standing—which forgoes any allegation that DRNY's constituents are members of the organization or that they exhibit any indicia of such membership—fails as matter of black-letter law. Mere authorization to represent a third party's interests is insufficient "to confer Article III standing on private parties with no injury of their own." *Hollingsworth v. Perry*, 570 U.S. 693, 710 (2013).

DRNY's new theory of representational standing is an attempt to end-run the indicia-of-membership requirement. But as this Court recog-

---

protection and advocacy system (see *supra* at 7), the question reserved in *Disability Advocates* still is not presented here because of DRNY's express disavowal of associational standing.

19

nized in *Disability Advocates*, that requirement is essential for the representational standing doctrine to comport with Article III. 675 F.3d at 159. Requiring an organizational plaintiff to show that its constituents exercise representation and control within the organization is necessary to ensure that the organization has filed the lawsuit in a truly "representational" sense—acting for persons who "participate in and guide the organization's efforts," *Association for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994); *Missouri Prot. & Advoc. Servs., Inc. v. Carnahan*, 499 F.3d 803, 809 (8th Cir. 2007), and for whom the organization is "the means by which they express their collective views and protect their collective interests," *Hunt*, 432 U.S. at 345. Without representation and control, nominally "representational" standing would impermissibly empower advocacy organizations to pursue independent policy agendas without regard for "the autonomy of those who are most directly affected" by a defendant's action. *See Alliance for Hippocratic Medicine*, 602 U.S. at 379-80 (quotation marks omitted). The requirement to show that at least one individual having "indicia of membership" would have standing in his or her own right is thus "an element of the constitu-

20

tional requirement of a case or controversy." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 554-55 (1996) (quotation marks omitted); *see Disability Advocates*, 675 F.3d at 159.

In arguing that it can establish standing without alleging injury to any member (or to any constituent with indicia of membership), DRNY misplaces its reliance (DRNY Br. at 8) upon *United Food*. In that case, the Supreme Court explained that the representational-standing doctrine satisfies the demands of Article III only because it "requir[es] an organization suing as representative to include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." 517 U.S. at 555. Indeed, the requirement of an injury to a member "can only be seen as itself an Article III necessity for an association's representative suit." *Id.*; *see Disability Advocates*, 675 F.3d at 159 (similar). So while Congress can relax prudential standing rules and thus "expand standing to the full extent permitted by Art[icle] III" (DRNY Br. at 8 (quotation marks omitted); *see id.* at 20-22), that principle does not help DRNY here. *See Disability Advocates*, 675 F.3d at 157, 159.

21

DRNY errs in relying (Br. at 9-10, 16) on *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148 (2d Cir. 1993). In *Kreindler*, this Court explained that a qui tam relator "invokes the standing of the government" to recover damages for an injury to the government. *Id.* at 1154. The Supreme Court subsequently clarified the justification for finding Article III satisfied in this context: through the False Claims Act, the federal government effects a partial assignment of its own damages claims, thus permitting a qui tam relator to invoke the "doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773, 778 (2000). That theoretical justification is not present here, because no nonparty individual has assigned any claim to DRNY. To the contrary, individuals with disabilities (including the individual plaintiffs and proposed intervenors in this case) retain full right and authority to decide whether and how to pursue claims like those that DRNY seeks to advance.

DRNY also cites (DRNY Br. at 17-18) the Supreme Court's decision in *Virginia Office for Protection & Advocacy v. Stewart*—but no question of standing (representational or otherwise) arose in that case, because

22

the organizational plaintiff alleged a violation of *its own* right to access state records. *See* 563 U.S. 247, 252 (2011). The case instead concerned only whether the state defendant was immune from suit. *See id.* at 250, 253-54. DRNY's quotations from the Supreme Court's summary of the statutory background (Br. at 17-18) have nothing to do with third-party standing or with Article III more generally. *See* 563 U.S. at 251-52.

DRNY's district-court cases (Br. at 18-20) are unavailing. DRNY cited three of those decisions in *Disability Advocates*,[4] but this Court rightly found them unpersuasive because they "elided the constitutional dimensions" of standing. 675 F.3d at 159. And DRNY's remaining case commits the same fundamental error: Like DRNY itself (see *supra* at 21), the Indiana district court incorrectly relied on *United Food*'s discussion of the prudential aspect of associational standing to invent a mistaken theory of "statutory standing" that disregards the requisites of Article III. *See Indiana Prot. & Advoc. Servs. Comm'n v. Indiana Fam. & Soc. Servs.*

---

[4] *See* Br. for Pl.-Appellee Disability Advocates, Inc. at 67-68, *Disability Advocates*, 675 F.3d 149 (No. 10-235), 2010 WL 4063233 (citing *Trautz v. Weisman*, 846 F. Supp. 1160, 1163 (S.D.N.Y. 1994); *Rubenstein v. Benedictine Hosp.*, 790 F. Supp. 396, 408 (N.D.N.Y. 1992); and *Goldstein v. Coughlin*, 83 F.R.D. 613, 614 (W.D.N.Y. 1979)).

*Admin.*, 630 F. Supp. 3d 1022, 1029-30 (S.D. Ind. 2022). The defect in DRNY's standing here is not a merely prudential matter. Rather, DRNY fails to satisfy the essential elements of Article III's case-or-controversy requirement. *See United Food*, 517 U.S. at 554-55; *Disability Advocates*, 675 F.3d at 159. As the district court in this case correctly observed, quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), "Congress cannot erase Article III's standing requirements"—here, the requirement to identify an injured member—"by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." (SPA 14.) And contrary to DRNY's mistaken assumption (*see* DRNY Br. at 21-22), Congress lacks authority to confer standing on an entity that fails to satisfy Article III's minimum requirements.[5]

Declining DRNY's invitation to invent a new theory of standing divorced from membership will not prevent the organization from fulfilling its mission to protect and advocate for individuals with disabilities.

---

[5] Recent and well-reasoned district court decisions have rejected DRNY's novel representational standing theory for this reason. *See, e.g.*, *Disability Rights N.Y. v. New York*, No. 17-cv-6965, 2019 WL 2497907, at *5-10 (E.D.N.Y. June 14, 2019), *report and recommendation adopted*, 2024 WL 20753, at *15-16 (E.D.N.Y. Jan. 2, 2024).

24

DRNY is free to advocate for such individuals by (for example) identifying specific plaintiffs, providing them with legal representation, and bringing actions (including class actions, where appropriate) in those plaintiffs' names. DRNY took that approach in this case (*see* J.A. 1-7), and has done so in other lawsuits as well. *See, e.g., Disability Rights*, 2019 WL 2497907, at *1; *Joseph S. v. Hogan*, 561 F. Supp. 2d 280 (E.D.N.Y. 2008).

In contrast, a decision authorizing DRNY to seek sweeping relief under its novel theory of statutory representational standing—without either securing class certification or identifying injured members—would raise serious concerns. Just as Federal Rule of Civil Procedure 23 is designed to ensure that class members are not unfairly deprived of their rights,[6] in representational-standing cases the "very forces that cause individuals to band together . . . provide some guarantee that the association will work to promote their interests." *International Union, United Auto., Aerospace & Agric. Implement Workers v. Brock*, 477 U.S. 274, 290 (1986). Allowing organizations like DRNY to litigate on behalf

---

[6] *See generally* Fed. R. Civ. P. 23(a)(4), (c), (d)(1)(B), (e); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 231-40 (2d Cir. 2016).

of nonmembers would put such individuals at risk of having their interests impaired or compromised without consent or even notice. The requirement of membership (or its functional equivalent) avoids such outcomes by ensuring that individuals whose interests may be affected by a lawsuit have the opportunity to influence the litigation—or, at minimum, to opt out of the organization and thus to avoid the effects of any judgment or settlement. Because DRNY's nonparty constituents have no such opportunity, the organization lacks standing to sue on their behalf. *See Disability Advocates*, 675 F.3d at 157, 159.

## B. The Individual Plaintiffs' Claims Are Moot, and No Exception Applies.

Unlike DRNY, the individual plaintiffs at least colorably alleged injuries-in-fact—i.e., allegedly unlawful delays in securing residential placements for themselves. Although the individual plaintiffs' legal challenges to those delays were unlikely to succeed (J.A. 226-233), the district court ultimately determined that it had no jurisdiction to reach the merits of those challenges (SPA 14-15). That decision was correct, because it is undisputed that all of the individual plaintiffs have secured the residential placements that they sought by bringing suit—rendering their

26

claims moot. (J.A. 442, 445.) The individual plaintiffs attempt on appeal to invoke several exceptions to the mootness doctrine, but those efforts all fail.

### 1. The individual plaintiffs' claims do not trigger the exception for "inherently transitory" classes.

The individual plaintiffs first argue (Br. of Pls.-Appellants A.H. et al. (A.H. Br.) at 21-26) that the case is not moot because they assert claims on behalf of a putative class whose membership is so "inherently transitory" that the district court did not "have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." *Elisa W. v. City of New York*, 82 F.4th 115, 122 n.2 (2d Cir. 2023) (quoting *Comer v. Cisneros*, 37 F.3d 775, 799 (2d Cir. 1994)). This contention is belied by the fact that this case was pending for some eighteen months before the last of the individual plaintiffs' claims was rendered moot in or around January 2024. (*See* J.A. 11, 441-443.) Moreover, several of the individual plaintiffs allege that they had been eligible for placement in residential facilities for multiple years before they joined this action. (J.A. 96, 108, 111, 113; *see* J.A. 181 & n.5.) The individual plaintiffs concede that such periods would allow sufficient

27

time for a proposed class representative to obtain a ruling on a motion for class certification. *See* A.H. Br. at 25. That concession is enough to foreclose application of the exception for inherently transitory classes here.

In contradistinction to the litigants in the cases on which the individual plaintiffs rely (A.H. Br. at 22-23), the individual plaintiffs here never made a motion for class certification while the case was pending below. *Cf. Elisa W.*, 82 F.4th at 121; *Salazar v. King*, 822 F.3d 61, 72 (2d Cir. 2016); *Comer*, 37 F.3d at 784; *Robidoux v. Celani*, 987 F.2d 931, 934 (2d Cir. 1993). Had the individual plaintiffs made such a motion, the district court could readily have decided the certification question before the case became moot. Citing *Salazar*, the individual plaintiffs assert (A.H. Br. at 25) that their putative class must be inherently transitory because average wait times for placement in residential facilities are around six months (J.A. 180). But *Salazar* said that an average period of less than three months (and a maximum of around six months) would be insufficient to guarantee decision on class-certification prior to the proposed representative's claims becoming moot. 822 F.3d at 74. The average and maximum periods alleged in this case (six months and multi-

28

ple years, respectively, *see* J.A. 96, 108, 111, 113, 180, 181 & n.5) exceed the comparable periods in *Salazar*.

The individual plaintiffs argue that this Court should overlook their failure to move for certification because the district court did not rule more promptly on defendants' partial motion to dismiss (A.H. Br. at 31-32)—but nothing prevented a motion for class certification based on the claims as originally pleaded. The individual plaintiffs also complain about defendants' discovery responses (A.H. Br. at 12-14, 32)—but they do not challenge the district court's discovery order (J.A. 406-407), do not allege that defendants failed to comply with that order,[7] and do not identify any evidence without which they were unable to file a certification motion.

The individual plaintiffs' attempt to invoke the exception for inherently transitory classes also fails because they have not established the existence of a "constant class of persons" whose interests the individual plaintiffs could properly represent. *See Salazar*, 822 F.3d at 73

---

[7] While the discovery correspondence was not filed on the district court docket, defendants produced thousands of pages of document discovery in compliance with the district court's order. (*See* J.A. 445 (plaintiffs acknowledging defendants' production of "policy-related documents"); SPA 16-17.)

29

(quotation marks omitted); *J.D. v. Azar*, 925 F.3d 1291, 1311 (D.C. Cir. 2019). As the district court explained (SPA 20-21), no such class exists in this case because plaintiffs do not advance a theory under which a class could be certified. For one thing, the individual plaintiffs cannot satisfy the commonality requirement of Federal Rule of Civil Procedure 23(a)(2)— under which a class cannot be certified unless aggregate litigation will generate common *answers* to shared questions, so as to "drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quotation marks omitted). Here, the proposed class would not be certified for the purpose of challenging any specific class-wide practice, *see id.* at 357, but instead would contend that the placement process has moved too slowly in each individual's case. Each claim would necessarily turn on myriad individualized questions relating to the specific facts and circumstances of the particular claimant's case—such as the needs, preferences, and available resources that affect the timing of each individual's placement in a residential facility. There are no common answers to such questions, so class certification would be impermissible.

The plaintiffs' distinct individual circumstances also mean that a motion for class certification would fail under Rule 23(b)(2). An injunction

30

class like the one that the individual plaintiffs proposed to represent is permissible "only when a single injunction . . . would provide relief to each member of the class." *Dukes*, 564 U.S. at 360; *Berni v. Barilla S.p.A.*, 964 F.3d 141, 146 (2d Cir. 2020). In this case, there is no lawful injunction that could provide relief to each putative class member (*see* SPA 21): An injunction merely directing defendants to "promptly" place each individual in a residential facility would violate Rule 65(d)'s clarity and specificity requirements, *see, e.g.*, *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996); *Rosen v. Siegel*, 106 F.3d 28, 32 (2d Cir. 1997); but a fixed one-size-fits-all deadline would in many circumstances exceed the State's obligations under the Medicaid Act, *see* 42 U.S.C. § 1396a(a)(3), (8) (requiring only "reasonable promptness"); *id.* § 1396n(c)(2)(C) (requiring provision only of "feasible" and "available" residential alternatives). Nor could the district court order defendants to change the State's system for placing eligible individuals in residential facilities (e.g., by requiring OPWDD "to be the provider of last resort," J.A. 470), because such an order would impermissibly require the State to "fundamentally alter" its program (*see* J.A. 153-159, 168-178, 230-231). *See* 28 C.F.R. § 35.130(b)(7); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603, 605-06 (1999).

31

Finally, there is no support for the individual plaintiffs' suggestion that defendants offered residential placements to the individual plaintiffs only out of a supposedly improper desire "to try to moot meritorious class claims" (A.H. Br. at 25-26). As discussed (*supra* at 4-6), identifying and securing a potential placement is a complex and multilayered process requiring consensus among not only OPWDD and the individual seeking placement (and sometimes the individual's family), but also the particular facility at which the individual is to reside. (*See* J.A. 146-147, 154, 159, 168-178, 181-182, 185-186.) The individual plaintiffs' assertions that defendants exercise "complete control" over the timing of placement decisions (A.H. Br. at 25-26) is false: OPWDD has no control over many aspects of the placement process, and in particular it has no power to compel voluntary providers to accept particular individuals for residential care and treatment. (J.A. 154, 186.)

32

2. **The individual plaintiffs' claims do not trigger the exception for claims that are "capable of repetition yet evading review."**

The individual plaintiffs next contend (A.H. Br. at 27-29) that their alleged injuries are "capable of repetition yet evading review." This mootness exception applies only to individual claims (not to class claims), and it "is not applicable unless the repetition would affect the same complaining party," *Doherty*, 101 F.4th at 173 (quotation marks omitted). To invoke the exception, the plaintiff must establish both (1) a "reasonable expectation" or "demonstrated probability" that he or she will again be subject to the same challenged action; and (2) that the future challenged action will be of too short a duration to be fully litigated before it ceases again. *Exxon Mobil Corp. v. Healey*, 28 F.4th 383, 395-96 (2d Cir. 2022); *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 647-48 (2d Cir. 1998); *Dennin v. Connecticut Interscholastic Athletic Conf., Inc.*, 94 F.3d 96, 100-01 (2d Cir. 1996).

The individual plaintiffs do not satisfy either element of this test. On the first point, none of the individual plaintiffs has established a reasonable expectation, let alone a demonstrated probability, that he or she will again face the alleged deprivation that the amended complaint

33

sought to remedy—i.e., allegedly unreasonable delay before placement in a residential facility. The individual plaintiffs' only evidence on this point is the allegation that a single individual plaintiff, L.P., purportedly "cycled in and out of institutional settings." A.H. Br. at 27-28. But L.P.'s situation was sui generis,[8] and even she faced only a single instance of having to await a new placement after her then-guardian discharged her from her original residential facility (J.A. 101). None of the other seventeen individuals identified in this action claims to have faced even a single recurrence of the conduct that they wish to challenge. (*See* J.A. 37-41, 55-56, 90-99, 102-113, 363-381.)[9]

---

[8] The pleadings in the lawsuit referenced in the amended complaint (J.A. 100-101) disclose that L.P. was transported to a hospital "after displaying aggressive behaviors" that "could not be managed" at the residential facility where she had been placed. Compl. ¶¶ 46-47, *Mental Hygiene Legal Serv., Third Department v. Kastner*, No. 1:20-cv-957 (N.D.N.Y. Aug. 19, 2020), ECF No. 1. L.P. could not return to her prior residential facility upon being released from the hospital because her then-guardian had discharged her from all of that residential facility's services during her hospitalization; that guardian was later removed from her position. *See id.* ¶¶ 43, 48-49.

[9] Contrary to the individual plaintiffs' contention (A.H. Br. at 28), this case is not "analogous" to *Olmstead*. Each of the plaintiffs in that case had been subject to multiple and unstable placements in a psychiatric hospital (one of them "eighteen different times") despite their desire for stable, community-based treatment. *L.C. ex rel. Zimring v. Olmstead*, 138 F.3d 893, 895 & n.2 (11th Cir. 1998); *see Olmstead*, 527 U.S. at 594 n.6.

The individual plaintiffs otherwise can only speculate that, for unspecified reasons, they might in the future be removed from their current residential facilities, and might then face unreasonable delays before being placed in alternative residential facilities. These merely theoretical possibilities are too speculative to establish an ongoing case or controversy. *See Exxon Mobil*, 28 F.4th at 396 (collecting cases).

Even assuming a hypothetical future in which the individual plaintiffs are removed from their current residential facilities and placed back in institutional settings, there is no basis to conclude that any future challenge to such a placement would evade review. Quite the contrary: A future lawsuit would have to be premised on an individual plaintiff's fear of unreasonable delay in obtaining a new placement, and (as discussed above, at 27-29) that very delay would provide the opportunity to seek and obtain judicial intervention.

35

### 3. The individual plaintiffs' claims do not trigger the "voluntary cessation" exception.

The individual plaintiffs' claims also do not fall under the voluntary cessation doctrine, as plaintiffs incorrectly suggest (A.H. Br. 29-30). This case is moot because the individual plaintiffs have all been placed in residential facilities, and there is no reasonable, nonspeculative possibility that any individual plaintiff will be removed from his or her residence and then subjected to prolonged delay in obtaining a new residential placement in the future. *See Exxon Mobil*, 28 F.4th at 395; *Lillbask ex rel. Mauclaire v. Connecticut Dep't of Educ.*, 397 F.3d 77, 88-89 (2d Cir. 2005); *Farrell v. Hochul*, No. 22-517, 2023 WL 3014758, at *1 (2d Cir. Apr. 20, 2023) (summary order).

The individual plaintiffs do not argue otherwise with respect to themselves. Instead, they point to allegedly unreasonable delays faced by "others in the putative class." A.H. Br. at 30. But if other putative class members face such delays, then there has been no voluntary cessation of the challenged conduct with respect to those individuals. Any such individual with a live claim may sue in his or her own name. The individual plaintiffs here—who have not been appointed to serve as representatives of the putative but uncertified class—have neither authority nor stand-

36

ing to assert the interests of unnamed third parties who are not before the Court.

\*   \*   \*

Finally, the district court's determination to dismiss the individual plaintiffs' moot claims sua sponte and without full briefing does not supply grounds for reversal, as plaintiffs wrongly contend (A.H. Br. at 41-44). The individual plaintiffs agree that this Court can and should resolve the mootness issues on the existing record (*id.* at 18, 43), and they do not identify any question with respect to which remand for fact development might be necessary. Moreover, as this Court recognized in one of the cases upon which plaintiffs rely (*id.* at 41, 43), summary dismissal is permissible when subject matter jurisdiction is lacking because the federal courts are obligated to consider subject matter jurisdiction sua sponte. *International Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 54 n.1 (2d Cir. 2022). Here, the district court did not commit reversible error by dismissing the individual plaintiffs' moot claims after those very plaintiffs admitted that they have no live cause of action (*see* J.A. 445). *See International Code Council*, 43 F.4th at 53-54 n.1; *Grossman v. GEICO Cas. Co.*, No. 21-2789, 2022 WL 1656593, at \*4 (2d Cir. May 25, 2022) (summary order) (no

37

reversible error in summary dismissal in view of complaint's substantial legal deficiencies).

## POINT II

### THE DISTRICT COURT PROPERLY DENIED THE MOTION TO INTERVENE

Having correctly dismissed the amended complaint for lack of subject-matter jurisdiction, the district court did not abuse its discretion in denying the motion to intervene. (SPA 15-21.)

On appeal, the proposed intervenors argue only that they were entitled to intervene as of right under Rule 24(a)(2). (*See* A.H. Br. at 34-41.) But that Rule allows for intervention only where, among other requirements, the proposed intervenor "is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest" in the case. Fed. R. Civ. P. 24(a)(2). Here, the district court's disposition of the action (dismissal for mootness and lack of standing) does not in any way impede the proposed intervenors' interests: The dismissal was inherently without prejudice, *see Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121, 123 (2d Cir. 1999), and it has no preclusive effect against the proposed intervenors, *see St. Pierre v. Dyer*,

38

208 F.3d 394, 400-01 (2d Cir. 2000); *Siegel v. Apergis*, 610 F. App'x 15, 16 (2d Cir. 2015). Thus, as the district court concluded, the disposition does not prejudice the proposed intervenors, for they remain free to file their own lawsuits insofar as they have live causes of action. (SPA 21.) That determination—which the proposed intervenors do not contest—is a sufficient ground to affirm the district court's denial of intervention under Rule 24(a)(2). *See In re Bank of N.Y. Derivative Litig.*, 320 F.3d 291, 300 (2d Cir. 2003).

In addition, as the district court correctly determined (SPA 19-21), the proposed intervenors have no cognizable "interest relating to the property or transaction that is the subject of the action," Fed. R. Civ. P. 24(a)(2). To satisfy this requirement, a proposed intervenor's interest in the action must be "direct, substantial, and legally protectable." *Washington Elec. Coop., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97 (2d Cir. 1990). Here, the proposed intervenors never had an interest in the now-moot claims asserted by the individual plaintiffs—the placement of any individual plaintiff in a residential facility based on the facts and circumstances of that person's particular situation had no effect on any proposed intervenor. (SPA 19.) While the proposed intervenors might

39

in theory have claimed an interest relating to the putative class claims (SPA 20), any such interest had vanished by the time the district court issued its decision: All of the proposed intervenors had "already been transitioned to the community" by February 1, 2024. (J.A. 496; *see* J.A. 445.) The proposed intervenors thus have no substantial or legally protectable interest in the case.

The district court also correctly concluded (SPA 20-21) that the proposed intervenors cannot claim an interest in the putative class claims for another reason. An interest does not satisfy Rule 24(a)(2) if it is "contingent upon the occurrence of a sequence of events before it becomes colorable," *Washington Elec.*, 922 F.2d at 97, and an asserted interest is impermissibly contingent if, for example, it depends upon the outcome of a legal proceeding, *see, e.g.*, *St. John's Univ., N.Y. v. Bolton*, 450 F. App'x 81, 83 (2d Cir. 2011). Many recent decisions have concluded that a proposed intervenor does not have a cognizable interest in the claims of a putative class unless and until that class has been certified: Absent

40

certification, the disposition of claims asserted in a putative class action has no effect on absent third parties.[10]

Here, the proposed intervenors' supposed interests in the claims of the putative class are contingent not only upon class certification being granted, but even upon such a motion being made. Moreover, as the district court made clear (SPA 20-21), any such motion would likely fail—both because the varied circumstances of the putative class members would preclude a finding of commonality, and because the courts could not lawfully grant class-wide injunctive relief. See *supra* at 29-31. The proposed intervenors do not contest that conclusion, nor do they otherwise show that a belated motion for class certification could succeed.

Moreover, as the proposed intervenors' own authority explains (*see* A.H. Br. at 40), they could not obtain class certification even if they were to enter the case: Because the proposed intervenors' individual claims are already moot (see *supra* at 11, 40), they "can no longer adequately

---

[10] *See, e.g.*, *Authors Guild v. Open AI, Inc.*, 345 F.R.D. 585, 590 (S.D.N.Y. 2024), *appeal docketed*, No. 24-1007 (2d Cir. Apr. 15, 2024); *Calderon v. Clearview AI, Inc.*, No. 20-cv-1296, 2020 WL 2792979, at *5 (S.D.N.Y. May 29, 2020); *Travis v. Navient Corp.*, 284 F. Supp. 3d 335, 342-43 (E.D.N.Y. 2018); *Mejia v. Time Warner Cable Inc.*, No. 15-cv-6445, 2017 WL 3278926, at *18 (S.D.N.Y. Aug. 1, 2017).

represent the interests of the proposed class" even if the other requisites to certification were met. *Eckert v. Equitable Life Assurance Soc'y*, 227 F.R.D. 60, 64 (E.D.N.Y. 2005).

The proposed intervenors' other cases (*see* A.H. Br. at 36-40) are all distinguishable. For example, in *Norman v. Connecticut State Board of Parole*, 458 F.2d 497, 499 (2d Cir. 1972) (per curiam); *In re Bear Stearns Cos., Inc. Securities, Derivative, & ERISA Litigation*, 297 F.R.D. 90, 93 (S.D.N.Y. 2013); and *Diduck v. Kaszycki & Sons Contractors, Inc.*, 149 F.R.D. 55, 57 (S.D.N.Y. 1993), the intervenors sought to enter a case to litigate as representatives of a class that had already been certified. Similarly, in *Gaddis v. Wyman*, the plaintiff had filed an apparently meritorious certification motion, such that the proposed intervenor had interests both in the outcome of the case and in the preliminary question of class certification. 304 F. Supp. 713, 717 (S.D.N.Y. 1969). No such motion has been made in this case—and again, plaintiffs do not contest the district court's determination that any such motion would likely fail.

Finally, the district court properly determined that the motion to intervene was untimely. (SPA at 15, 18-19.) This question turns primarily on (1) how long the proposed intervenor had notice of its interest in the

42

case before it made the motion; (2) the prejudice to the existing parties resulting from the proposed intervenors' delay in filing; and (3) any prejudice to the applicant if the motion is denied. *See In re Bank of N.Y.*, 320 F.3d at 300. Here, each factor weighs in favor of the district court's determination: (1) the intervenors' attorneys had notice of their interest in the case more than a year before they sought to intervene; (2) granting the motion after such an extended delay would prejudice defendants by forcing them to continue expending resources to defend a lawsuit in which there is no live case or controversy; and (3) denying the motion does not prejudice the proposed intervenors, who remain free to file their own lawsuits. The proposed intervenors only address the first point—arguing that they sought to join the case upon realizing that the putative class would have no representative once the individual plaintiffs' claims become moot. A.H. Br. at 35-38. That argument is insufficient to support overturning the decision below, because the putative class is not susceptible of certification. In any event, the proposed intervenors do not attempt to show that they face any prejudice from the district court's order which could justify forcing defendants to continue defending against moot claims and an uncertifiable plaintiff class.

43

## CONCLUSION

The judgment should be affirmed.

Dated:   New York, New York
         July 3, 2024

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellees

By:   */s/ Cleland B. Welton II*
      CLELAND B. WELTON II
      Assistant Solicitor General

BARBARA D. UNDERWOOD                    28 Liberty Street
  *Solicitor General*                   New York, NY 10005
MATTHEW W. GRIECO                       (212) 416-6197
  *Senior Assistant Solicitor General*
CLELAND B. WELTON II
  *Assistant Solicitor General*
    *of Counsel*

44

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Emily Paule, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 8,499 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

_/s/ Emily Paule_